UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

06 CA 11967 RGS

HUDSON SAVINGS BANK,

Plaintiff,

v.

PROGRESSIVE CASUALTY INSURANCE
COMPANY,

Defendant.

**AFFIDAVIT OF FRANCESCO LEONE IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON THE ISSUE OF MATERIALITY**

I, Francesco Leone, am a senior underwriter in the Professional Liability Group at

Progressive Casualty Insurance Company ("Progressive").  I have personal knowledge of

the facts stated herein, except where stated to be upon information and belief.  I make this

affidavit in support of Progressive's Motion for Summary Judgment on the Issue of

Materiality and state as follows:

1.      I have been a commercial lines underwriter at Progressive for sixteen

years.  I spent the first two years at Progressive in the commercial auto department, and

have spent the last fourteen years in the Professional Liability Group.

2.      For the last seven years, I have been a senior underwriter in the

Professional Liability Group.

3.      Progressive has been underwriting community bank insurance for over

twenty years and considers itself to be a community bank insurance specialist.

***Progressive's Underwriting of the Hudson Bonds***

4.      Progressive issued Financial Institution Bonds to Hudson No. 10034416-01 for the policy periods dating from July 1, 2003 to July 1, 2004 and from July 1, 2004 through July 1, 2005 (that policy period was later extended through November 4, 2005) (the "Bonds").  A true copy of portions of the Bond Progressive issued to Hudson for the policy period dating from July 1, 2004 to November 4, 2005 is attached as **Exhibit 1**.

5.      One of the primary coverages provided by a financial institution bond is coverage against loss due to employee dishonesty.

6.      The Bonds included "fidelity" coverage under which Progressive agreed to indemnify Hudson for "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others."  The fidelity coverage was in the amount of $4,000,000 with a $50,000 deductible.  See Exh. 1 at p. PC 00703.  Fidelity coverage insures against risks of loss due to dishonesty by the insured's employees.

7.      Progressive had its first opportunity to make a proposal for a financial institution bond for Hudson in 2003.  Progressive received from Hudson's agent a copy of the application Hudson had completed for its incumbent carrier, Hanover Insurance Company.  A copy of selected portions of that application form is attached as **Exhibit 2**.

8.      One of my colleagues, senior underwriter Jason Faulkner, performed the initial underwriting analysis based upon the Hanover application and financial information about Hudson that was publicly available.  A true copy of Mr. Faulkner's analysis is attached as **Exhibit 3**.

9.      In connection with obtaining each of the Bonds, Progressive required Hudson to complete and submit a bond application on Progressive's form.  Progressive conveyed to Hudson the requirement to submit our application form by the letter attached as **Exhibit 4**.  See PC 03211.  (Some of the handwritten markings were put on the letter after it was sent.)

10.     On or about July 14, 2003, Hudson submitted a financial institution bond application form to Progressive ("Original Bond Application").  The Original Bond Application was made part of the bond when the bond was issued.  A true copy of portions of the Original Bond Application Hudson submitted to Progressive for the policy period dating from July 1, 2003 to June 30, 2004 is attached as **Exhibit 5**.

11.     The following year, on or about June 4, 2004, Hudson completed and submitted another bond application on Progressive's form ("2004 Bond Application").  The 2004 Bond Application was made part of the bond when the bond was issued.  A true copy of portions of the 2004 Bond Application Hudson submitted to Progressive for the policy period dating from July 1, 2004 to November 4, 2005 is attached as **Exhibit 6**.

12.     "Internal controls" is a term of art that refers to controls that a business, including a financial institution, has in place to mitigate or prevent, among other things, loss due to employee dishonesty.   A good program of internal controls identifies those areas of a bank's operations that increase the probability of loss and imposes a combination of rules, processes, protocols, physical and electronic barriers, checks and balances calculated to prevent, manage, detect and control such losses.

13.     Part IV of each of the Bond Applications dealt with the issue of internal controls at Hudson.  At the end of Part IV of each application the applicant was instructed

"If any of the answers in Part IV are 'No', provide details here or by attachment." Exh. 6 at PC 00352.

14.     Employee dishonesty can cause loss to a bank through embezzlement of bank assets or through theft of customer assets that the bank is required to restore to the customer.  When Progressive considers whether to provide this type of coverage to a financial institution, it seeks information that would enable its underwriters to assess the risk of a loss due to employee dishonesty occurring.

15.     For this reason, the issue of internal controls is extremely important to bond underwriters at Progressive.  If an application comes in that answers any of the questions in Part IV "No," our routine practice is **REDACTED**

**REDACTED**.

16.     Attached as **Exhibit 7** is a true copy of a fax sent by my assistant to the broker who submitted Hudson's Original Bond Application, requesting additional information from Hudson with respect to various internal controls questions that Hudson had answered **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

17.     On September 4, 2003, Progressive received a response to this request.  A true copy of Hudson's response is attached as **Exhibit 8**.

18.     I reviewed Hudson's response on September 5, 2003.  I was satisfied with the responses Hudson provided and caused the Bond to be issued shortly thereafter.

19.     Progressive received Hudson's 2004 Bond Application (Exhibit 6) in early to mid-June, 2004.

20.     In considering Hudson's 2004 Bond Application, Progressive reviewed all the information submitted by Hudson in its application as well as public financial information.

21.     Attached as **<u>Exhibit 9</u>** is a true copy of the underwriting analysis prepared for me by junior underwriter Michael Kohl for the 2004 Bond Application.

22.     Mike saw that Hudson had answered **REDACTED** to Question IV.1b in the 2004 Bond Application.  Exhibit 6 at p. PC 00351.

23.     Mike sent a letter under my name proposing the pricing for coverage under a renewal bond.  In accordance with Progressive's underwriting guidelines, the proposal was contingent on **REDACTED**                     A true copy of that letter, dated June 24, 2004, together with its enclosures that related to the renewal bond, are attached hereto as **<u>Exhibit 10</u>**.  (The handwritten marks on the attached pages were put on the documents after the letter went out.)

24.     The response Progressive received to our June 24, 2004 letter is attached hereto as **<u>Exhibit 11</u>**.

25.     I personally reviewed Hudson's response to our request for additional information concerning **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED** .

26.     I was impressed with this answer, as it showed heightened diligence and a serious commitment to good internal controls.

### *Progressive's Underwriting Policies on Insurability Regarding Internal Controls*

27.     Each of the questions in Section IV ("Internal Controls") of the Bond Applications seeks from the insured information that Progressive's underwriters use to evaluate whether an applicant is more or less likely to produce a loss.

28.     Questions, such as those at issue in this case, solicit information from a bank about its internal controls so that an underwriter can assess whether to provide insurance.

29.     Progressive maintains an Underwriting Manual that sets out Progressive's policies, procedures and guidelines for underwriting financial institution bonds.

30.     Progressive provides a copy of this document to each underwriter.  As Progressive makes changes in its Manual, the changes are also distributed to each underwriter.

31.     Progressive's bond underwriters and management meet bi-weekly during which we discuss various aspects of Progressive's Underwriting Manual and other issues. At some meetings, we discuss trends in the market regarding bond losses that have been experienced.  Also, Progressive sometimes has outside personnel with internal control/accounting backgrounds put on presentations at our meetings to discuss loss trends.

32.     In December 2002, Progressive designated certain questions on its Financial Institution Bond Application forms as **REDACTED**        .  Attached hereto as **Exhibit 12** is a true copy of the page of Progressive's Underwriting Manual regarding

**REDACTED**     adopted in December, 2002.  All the **REDACTED** questions involve internal controls.  We discussed during one or more of our bi-weekly meetings the designation of the questions identified on Exhibit 12 as **REDACTED**          .
**REDACTED**.

33.     Progressive has made changes to **REDACTED**          and to Progressive's underwriting guidelines over time based upon Progressive's assessment of the claims made under its bonds, the losses sustained by its insureds and feedback from its underwriters.  We discussed these changes at one or more of our bi-weekly meetings.

34.     Attached as **Exhibit 13** is a true copy of the page of our Underwriting Manual stating Progressive's policy regarding **REDACTED**          as of the time of underwriting Hudson's 2004 Bond Application in June-July 2004.

35.     Because of the importance of the internal control questions identified by Progressive **REDACTED**,          an underwriter was not permitted to underwrite the bond unless **REDACTED**
**REDACTED**
**REDACTED**.

36.     There have been times when **REDACTED**
**REDACTED**
**REDACTED**
**REDACTED**
**REDACTED** .

37.     Questions IV.1a, IV.1b and IV.5c were all designated **REDACTED**

by Progressive. All three questions concern internal controls that are at the center of a sound internal control system that every bank, no matter the size, should have in place. Without these controls, institutions relying only on good faith open themselves to substantial defalcations by the employees most trusted. Individually, the answers to these questions, but also together with the answers to the other questions on the application and with other information gathered, seek to provide sufficient intelligence about a bank so that Progressive's underwriters can assess whether to provide insurance. Each answered question in Section IV of the Progressive application obtains from an insured information that the underwriter uses to evaluate whether an applicant is more likely or less likely to produce a loss.

38.     Questions 1a and 1b of Part IV addressed Hudson's lending controls. In Question IV.1a, Progressive is seeking to discover whether loan officers have control not only to begin the lending process, document and approve the loan but also to take the final step of providing (disbursing) the funds to the borrower. If so, a lending officer has complete control of the lending transaction. The likelihood that an officer could create fictitious borrowers or misdirect the loan proceeds, causing an insurable loss on the financial institution bond greatly increases.

39.     Progressive seeks, in question IV.1b, to determine whether a bank has policies and procedures in place that help ensure loan instruments are genuine and issued to a valid borrower by ensuring that signatures of borrowers are obtained in the presence of a bank officer. In the production of loan business one of the common insurable loss scenarios involves loans to fictitious borrowers. In essence a bank needs to make sure that the person it thinks it is lending the money to is actually the person who signs the

lending documents.  Progressive's underwriters want to see that all on-site signatures are done in the presence of an officer or other employee.  If a bank has a practice of accepting loan documents signed off-site, the identity of signatories must be confirmed otherwise.

40.     In Question IV.5c, Progressive seeks to determine whether the bank has a formal, planned segregation of duties program.  Such a formal segregation of duties program is of paramount importance to secure operation of a financial institution. Without segregation of duties, or other mitigating controls and oversight, bank personnel would be able to control cash, loan and other transactions from beginning to end – from origination to posting – opening the bank to large losses.  Progressive would not provide a financial institution bond to a bank that had no segregation of duties or other mitigating controls and oversight, knowing that the risk of loss that such a bank presented would be much greater than that of other banks.  By itself, segregation of duties, the presence and pervasiveness of it, is one of the strongest indicators of risk of operational losses for a bank.  Together with other internal control indicators such as those addressed in the other two questions, it is even more indicative of the risk of loss level a bank is presenting to the underwriter.  A misrepresentation overstating the conditions underlying the answer to this question alone would understate the increased risk of loss.

41.     Under Progressive's rules concerning **REDACTED**         , the underwriters consider those questions in order to determine whether or not to provide a bond at all.  Progressive's underwriters refer to this issue as one of "insurability."

### *Progressive's Underwriting Policies on Rating Regarding Internal Controls*

42.     Insurability is a separate question from the question of what premium to charge for a bond Progressive has decided to write for an insurable bank.  Progressive's underwriters refer to this issue as one of "rating."  We do not address an issue of rating for a bank we consider uninsurable.

43.     Progressive's Underwriting Manual includes guidance on how underwriters are to consider a bank's internal controls in connection with rating.  An underwriter's task of rating a financial institution bond is not a mechanical process.  Rather, it involves the exercise of judgment in combination with evaluation of numerous factors that go into deciding what premium to charge.

44.     The Underwriting Manual guidance on rating that was in effect at the time Progressive underwrote Hudson's Original Bond in 2003 is contained in the pages attached as **Exhibit 14**.

45.     The Underwriting Manual guidance on rating that was in effect at the time Progressive underwrote Hudson's Renewal Bond in 2004 is contained in the pages attached as **Exhibit 15**.

46.     Both sets of rating guidelines make an evaluation of a bank's internal controls a factor in rating, and therefore in the pricing, of Progressive's financial institution bonds.

Signed under the penalties of perjury this _____ day of March, 2008.

/s/ Francesco Leone
Francesco Leone

# 5226629_v1