UNITED STATES DISTRICT COURT
FOR THE  DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUDSON SAVINGS BANK,<br><br>Plaintiff,<br><br>v.<br><br>PROGRESSIVE CASUALTY INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION No. 06-11967<br>)<br>)<br>)<br>)<br>)<br>) |

## OPPOSITION OF PLAINTIFF HUDSON SAVINGS BANK TO DEFENDANT PROGRESSIVE CASUALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Before the Court are cross-motions for summary judgment as to Progressive's liability under a Financial Institution Bond ("the Bond") for losses sustained due to employee embezzlement and fraud perpetrated by one of Hudson's branch managers, Milton Pereira. Hudson has moved for summary judgment declaring that (i) the Pereira losses are covered by the Bond, and (ii) because Hudson interpreted the Bond application questions according to their plain language and Progressive will not be able to show that Hudson's answers were inaccurate, Progressive is not entitled to rescind the Bond.[1]  Progressive has moved for summary judgment declaring that it is entitled to rescind the Bond due to two purported material misrepresentations allegedly made by Hudson during the Bond application process.  Progressive has never disputed that the Pereira losses fall within the scope of coverage of the Bond.  (SMF ¶ 40.)[2]

---

[1] *See* Hudson Savings Bank's Renewed Motion for Partial Summary Judgment (Dkt. No. 50) and supporting papers (Dkt. Nos. 51-56).

[2] Citations to "SMF" refer to Hudson's Concise Statement of Material Facts, which is contained within Hudson Savings Bank's Renewed Motion for Partial Summary Judgment (Dkt. No. 50).

It is notable that Progressive bases its summary judgment motion on two alleged material misrepresentations.  When Hudson submitted its formal Proof of Loss to Progressive in late 2005 for the losses resulting from Mr. Pereira's defalcations, Progressive responded by letter dated April 13, 2006 alleging that Hudson had made no fewer than *six* material misrepresentations in answering the Bond application questions, each of which entitled Progressive to rescind the Bond.  (SMF ¶ 41.)  On July 7, 2006, following receipt and review of additional information from Hudson, Progressive abandoned four of its misrepresentation allegations, but continued to assert that Hudson had made two material misrepresentations during the Bond application process.  (SMF ¶¶ 42-45.)  Then, two weeks later on July 20, 2006, Progressive again changed course and asserted an entirely new purported material misrepresentation, bringing the total number of alleged misrepresentations to three.  (SMF ¶ 46.)  Progressive reaffirmed its abandonment of four of the original six misrepresentation allegations in its Answer to Hudson's Complaint and, in its Counterclaim, restated the two remaining allegations of misrepresentation from the original six, along with the newly-alleged third misrepresentation.  (Answer and Counterclaim of Progressive Casualty Insurance Company to Complaint and Jury Demand of Hudson Savings Bank ("Answer & Counterclaim") (Dkt. No. 2), pp. 4-5, ¶¶ 31-32 and pp. 9-11, ¶¶ 11-15.)

Now, in connection with its motion for summary judgment, Progressive has abandoned one of the remaining three alleged misrepresentations − one of the original six − to arrive at the two misrepresentations that form the basis of its motion.[3]  Progressive's history of asserting and

---

[3] The alleged material misrepresentation that Progressive abandons for the first time in connection with this summary judgment motion relates to Question IV.5.c ("Q5c") of the Bond application, which asked:  "Is there a formal program requiring segregation of duties, so that no single transaction can be fully controlled from origination to posting by one person?"  (SMF ¶ 20.)  In light of this abandonment, and for the reasons set forth in Hudson Savings Bank's Memorandum in Support of Its Renewed Motion for Partial Summary Judgment ("Hudson Mem.") (Dkt. No. 51), the Court should grant judgment as a matter of law in Hudson's favor with respect to Progressive's counterclaim for rescission based on Q5c.

then abandoning misrepresentation allegations in this action is telling.  What is also telling is the way Progressive presents its two remaining misrepresentation allegations in its moving papers. Rather than addressing the issues in natural sequence − first attempting to show that there *were* misrepresentations, and only then reaching materiality, Progressive reverses the analysis. Indeed, Progressive devotes about two-thirds of its memorandum to minimizing its burden of proof on materiality, finally reaching the question whether there even was a misrepresentation almost as an afterthought.

Progressive's approach of putting the materiality cart before the misrepresentation horse is contrary to a logical misrepresentation analysis pursuant to the Massachusetts statute.  *See* Mass. G.L. c. 175, § 186 (assuming the presence of a misrepresentation before considering the materiality of the assumed misrepresentation).  In this opposition, Hudson declines to follow Progressive's awkward approach and instead, consistent with the organizational structure of its renewed summary judgment memorandum, addresses the issue of misrepresentation first and then considers the materiality of the alleged misrepresentations.

## RESPONSE TO PROGRESSIVE STATEMENT OF MATERIAL FACTS

With its motion, Progressive has filed a "Local Rule 56.1 Statement of Undisputed Material Facts" (the "Progressive Statement") as well as several affidavits.  Included among these supporting affidavits is the Affidavit of Douglas R. Emerick ("Emerick Affidavit"), who is proffered as a expert in insurance underwriting.  Portions of the Emerick Affidavit are derived from a so-called "Supplemental Report" produced by Progressive, *after* Mr. Emerick was deposed, in which he effectively recants his deposition testimony that his opinion on materiality is premised on the *combined* effect of all three supposed misrepresentations Progressive has (until now) asserted.  Because the "Supplemental Report" is not authorized by Fed. R. Civ. P. 26(a)(2)(B), 26(b)(4), and 26(e)(2) and seeks to undermine these summary judgment

proceedings, Hudson asks that the portions of the Emerick Affidavit that are derived from the "Supplemental Report" be disregarded and has filed a motion to strike seeking that relief.

As noted, Hudson has filed a renewed summary judgment motion of its own. Hudson's memorandum in support of its renewed motion contains a "Background" section setting forth material facts relevant both to that motion and the present opposition, and Hudson respectfully refers the Court to that memorandum for a recitation of facts which will not be repeated here. For purposes of this opposition only, Hudson contends that a genuine factual dispute exists with respect to the following issues:

1.    *Assuming* Hudson misrepresented its internal controls in answering Question IV.1.a ("Q1a") of the Bond application ("Are loan proceeds issued by someone other than the approving loan officer?"), would a reasonable insurer have changed its underwriting stance in view of complete information about Hudson's internal controls relating to Q1a?  (RMF ¶ 127.)[4]

2.    *Assuming* Hudson misrepresented its internal controls in answering Question IV.1.b ("Q1b") of the Bond application ("Are signatures on all notes and documents obtained in the presence of an officer?"), would a reasonable insurer have changed its underwriting stance in view of complete information about Hudson's internal controls relating to Q1b?  (RMF ¶ 128.)[5]

---

[4] Citations to "RMF" refer to Plaintiff Hudson Savings Bank's Local Rule 56.1 Responsive Statement of Material Facts in Opposition to Defendant Progressive Casualty Insurance Company's Motion for Summary Judgment, filed herewith.

[5] Progressive appears to seek a determination as to the materiality of Q5c despite that fact that it has abandoned its allegation of misrepresentation based on Hudson's response to this question.  Should the Court consider Progressive's Q5c materiality arguments nevertheless, Hudson contends that a genuine factual dispute exists with respect to the following issue:  *Assuming* Hudson misrepresented its internal controls in answering Q5c of the Bond application ("Is there a formal program requiring segregation of duties, so that no single transaction can be fully controlled from origination to posting by one person?"), would a reasonable insurer have changed its underwriting stance in view of complete information about Hudson's internal controls relating to Q5c?  (RMF ¶ 128.)

**ARGUMENT**

"[U]nder Massachusetts law, in order to void or rescind a policy of insurance or deny a claim based upon misrepresentations in an application for insurance, the insurer must demonstrate either that the misrepresentations were made with intent to deceive or that they increased the risk of loss to the insurer." *Technology Square, LLC v. United Nat'l Ins. Co.*, No. 04-10047-GAO, 2007 WL 534450, at *8 (D. Mass. Feb. 15, 2007) (citing *A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund*, 445 Mass. 502, 513 (2005)); *see also* Mass. G.L. c. 175, § 186. Progressive does not contend that Hudson made misrepresentations on the Bond application with an intent to deceive.  Rather, Progressive bases its misrepresentation contentions on an increased risk of loss theory, which "necessitates two inquiries: first, whether [Hudson] misrepresented facts in the insurance application; and second, whether the purported misrepresentations 'increased the risk of loss' to [Progressive]." *See Technology Square*, 2007 WL 534450, at *9.

As noted above, despite Progressive's unorthodox decision to address the issue of materiality ahead of misrepresentation in its memorandum, Hudson adopts in this opposition the accepted sequence of considering misrepresentation first followed by materiality.

**I.     MISREPRESENTATION**

The parties agree that the interpretation of the two Bond application questions at issue, and whether Hudson's answers to those two questions constitute misrepresentations, are issues appropriate for summary resolution by the Court.  With respect to interpretation of the Bond application questions, the parties agree that such interpretation is a matter of law for the Court to decide.  (Progressive Mem. at 16.)  As to whether Hudson's answers constitute misrepresentations, because the dispute centers around Hudson's interpretation of the application questions and not Hudson's answers themselves, this inquiry is also a matter appropriate for

resolution by the Court.  *See Aenta Life Ins. Co. v. Hub Hosiery Mills*, 170 F.2d 547, 551 (1st

Cir. 1948) (construing the language of a question in a policy application).

      **A.**      **Progressive Fails To Show That Hudson's Interpretation of Q1a Was Unreasonable Or That Hudson's Answer To Q1a Was Inaccurate.**

            **1.**      **It Was Not Unreasonable For Hudson To Interpret Q1a As Addressing Only Loans Involving An Approving Loan Officer.**

In an effort to bolster its Q1a misrepresentation position, Progressive takes a classic

"straw man" approach − mischaracterizing Hudson's argument, and then refuting the argument

as mischaracterized − never addressing the common-sense basis Hudson actually has advanced

for its interpretation of Q1a.  Progressive would like the Court to believe that Hudson's argument

regarding its answer to Q1a revolves around the issue of "credit risk."  But in fact, based on the

language of Q1a, the true issue concerns the term "approving loan officer" because Progressive

chose to use that specific term in Q1a.  What determines whether an approving loan officer is

involved in a particular loan happens to be whether that type of loan involves credit risk.  As

Hudson expressly acknowledged in its memorandum, "[t]o the extent that Progressive suggests

that [the issue of credit risk] is irrelevant because the risk in issue is of employee dishonesty [i.e.,

operational risk], not the credit worthiness of the borrower, Hudson agrees. . . .  The fact that

certain kinds of loans do not pose a credit risk to the bank is irrelevant to the interpretation of

Q1a"  (Hudson Mem. at 10 n.6.)

     The issue of credit risk is relevant only to the extent that it provides background and

context for determining how a reasonable community bank, such as Hudson, would understand

Q1a.  The true issue is whether it was reasonable for Hudson to construe Q1a as addressing only

loans that involve an approving loan officer.  As explained in Hudson's memorandum, the credit

risk "point is made merely to explain that some kinds of loans (those not involving credit risk to

the bank) are typically made without the participation of an approving loan officer."  (Hudson

Mem. at 10 n.6.)  Moreover, Progressive − as an insurer specializing in community banks − is charged with this knowledge.  *See City Fuel Corp. v. Nat'l Fire Ins. Co.*, 446 Mass. 638, 640 (2006) (stating that insurers are charged with the knowledge of the customs of the trade or business of their policyholders); *see also Compagnie de Reassurance v. New England Reinsurance Corp.*, 57 F.3d 56, 77 (1st Cir. 1995); *Daniels v. Hudson River Fire Ins. Co.*, 66 Mass. 416, 429-30 (1853).  Accordingly, Progressive must be held to the consequences of its own drafting decisions.

Progressive's straw man tactic can be clearly seen in its assertion that "Hudson . . . steadfastly maintains that, by using the term 'approving loan officer,' Progressive was only asking about those loans that involved credit risk."  (Progressive Mem. at 22.)  Contrary to Progressive's mischaracterization, Hudson's position is simply that, by using the term "approving loan officer," Q1a was asking only about those loans that involve an "approving loan officer."  As explained in detail in Hudson's memorandum in support of its renewed motion for summary judgment, it is common practice for community banks to allow one employee to process the application and disburse the funds for certain types of loans such as collateral (passbook) loans.  (SMF ¶ 93.)  In these circumstances, an approving loan officer would not be involved.  A community banker seeing the term "approving loan officer," as specifically used in Q1a, would therefore not have collateral (passbook) loans in mind when answering Q1a.  (SMF ¶¶ 94-96.)

Progressive essentially posits that it makes no sense to ask this question only with respect to loans that involve an approving loan officer, since all loans involve operational risk.  Thus, Progressive would have Hudson bear the responsibility of interpreting Q1a, contrary to its express language, as not seeking information only about loans involving an approving loan

officer, but rather information about whether two separate people are involved in the processing of all loans, including loans that do *not* involve an approving loan officer.  In effect, Progressive is asking this Court to read the approving loan officer limitation out of Q1a entirely to match what Progressive asserts that it *ought* to have asked in its Bond application.  But "the test is not what the insurer intended the words to mean but what a reasonable person in the position of the insured would have understood the words to mean."  *Cent. Int'l Co. v. Kemper Ins. Co.*, No. 97-CV-10630, 1999 WL 694048, at *2 (D. Mass. April 22, 1999) (quoting *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Wausau Paper Mills Co.*, 818 F.2d 591, 594 (7th Cir. 1987)).  Progressive's attempt to induce the Court to "redraft" Q1a in the face of the plain language of the question is improper and should be rejected.

Progressive's judicial redrafting gambit may also provide an explanation as to why Progressive elected to abandon its Q5c misrepresentation argument at the eleventh hour. Massachusetts contract law is clear that "the whole paper is to be construed together, and effect is to be given to all its parts, if it can be done consistently with a fair and reasonable interpretation of the contract."  *Elliot v. Hamilton Mut. Ins. Co.*, 79 Mass. 139, 144 (1859).  Q5c asked "Is there a formal program requiring segregation of duties, so that no single transaction can be fully controlled from origination to posting by one person?," and thus requested the broader "segregation of duties" type information that would apply to loans not involving an approving loan officer.  By dropping its Q5c argument now, Progressive seemingly hopes to hide the fact that its Bond application sought the very type of information elsewhere in the application that it now is trying to shoehorn into the scope of Q1a.  It appears that Progressive thought so little of its Q5c misrepresentation argument that it was willing to sacrifice Q5c in an effort to avoid having to acknowledge that Q5c undercuts its interpretation and argument with respect to Q1a.

The necessity of such gamesmanship further exposes the weaknesses of Progressive's misrepresentation defense as a whole.

At most, Progressive's point that collateral (passbook) loans involve operational risk would give rise to an ambiguity − an ambiguity created by Progressive's choice nonetheless to confine the question to loans involving an approving loan officer.  But ambiguities in policy applications are construed against the insurer.  *Shaw v. Commercial Ins. Co.*, 359 Mass. 601, 607 (1971).  Since Hudson reasonably interpreted Q1a in accordance with how the language of the question was customarily used by bankers, and any ambiguities in Q1a must be resolved in Hudson's favor, Q1a must be construed in favor of Hudson as not inquiring about the disbursal of funds from collateral (passbook) loans.  *See Compagnie de Reassurance*, 57 F.3d at 76-78; *Shaw*, 359 Mass. at 607.

> **2.    Progressive's Misleading Citation To The Deposition Testimony of Hudson's President Does Not Prove That Hudson's Answer To Q1a Was Inaccurate.**

In a further effort to establish that Hudson answered Q1a incorrectly, Progressive points to the testimony of Mark O'Connell, Hudson's President, that "[t]he loan officer in the case of a small auto loan, for example, could possibly produce a check to fund the loan on a auto loan." (Progressive Mem. at 20.)  Progressive, however, disingenuously fails to provide Mr. O'Connell's complete testimony on this issue and goes so far as to redact Mr. O'Connell's explanation of this testimony from the deposition transcript excerpt provided in support of Progressive's motion.  (*See* Affidavit of Deborah S. Griffin in Support of Defendant's Motion for Summary Judgment, Exh. A, at 14:1-16.)  Unlike all other attached transcript pages from Mr. O'Connell's deposition, Progressive took the additional step of redacted the remainder of this page, which provided Mr. O'Connell's explanation concerning his example of why he thought

Q1a was vague with respect to certain small auto loans.  Mr. O'Connell's testimony in its

entirety is reproduced below, with Progressive's excerpt bolded for reference:

> Q:  Which questions did you think were vague in [the Bond application]?
>
> **A:  For example the first one, some of the lending ones, "are all loan proceeds issued by someone other than the approving loan officer," they are by [sic] 99.9 percent of the time; but for auto loan, the loan officer who has lending authority could then produce a check on that.**
>
> **Q:  I couldn't hear you.**
>
> **A:  The loan officer in the case of a small auto loan, for example, could possibly produce a check to fund the loan on an auto loan.**
>
> **Q:  You said "could possibly"?**
>
> **A:  Yes, depending if they had the full lending authority, the size of the loan and everything, our  loan policy states different lending authority for different people.  Not everybody has the same authority.**
>
> Q:  You are saying if somebody had the authority to approve a loan, they could also produce the check for the loan proceeds?
>
> A:  They would have to go to the teller line to get it, obviously.  They can't produce it themselves, they have to go to the teller line to produce a check.
>
> Q:  I thought you just said they could produce it themselves?
>
> A:  Well, loan proceeds -- No, I said they could get a check themselves.  I'm differentiating from a residential closing where there are lawyers involved, home equity loans where they could process a loan.  An auto loan other than making sure we get the title, doing a credit rundown on the person, obviously, the person then once they had the lending authority could go and tell the customer this loan is a loan we'll make on your auto, giving us the title, and he would go to the teller and get a check right away, which is different from delaying for days.  People in most of the large, you know, residential loans of any type and commercial loans there is a numerous week delay between sometimes approval and closing.
>
> Q:  When you gave me the example of the small auto loan where the loan officer would get the check from the teller, in that situation would the loan officer deliver the check themselves to the customer?
>
> A:  If they are the ones dealing with the customer, they could give the check to the customer, correct.
>
> Q:  Did you select that example because the loan officer was the same person handing the check over as the person who approved the loan?

A:  Yes.

(October 1, 2007 Deposition of Mark R. O'Connell, at 13:23-16:1; RMF ¶ 98.)[6]

As is clear from Mr. O'Connell's complete testimony, in the case of a small auto loan, the approving loan officer may also be the individual that *provides the check to the borrower*. However, Progressive's excerpt of the testimony fails to acknowledge that a second individual − the teller − must be involved in issuing the loan proceeds.  Indeed, the loan officer's only involvement in issuing the loan proceeds is passing the check to the borrower.  That the loan officer may deliver the check to the borrower does not change the fact that the check was *issued* by someone else − namely, the teller.

For these reasons and the reasons set forth in Hudson's memorandum in support of its renewed motion for summary judgment, Progressive has no reasonable expectation of proving any misrepresentation with regard to Hudson's answer to Q1a, and Hudson therefore is entitled to judgment as a matter of law.  *See Deterra v. Am. W. Airlines, Inc.*, 226 F. Supp. 2d 298, 302-03 (D. Mass. 2002) (Where "the non-moving party will bear the burden of proof at trial, Rule 56(c) mandates the entry of summary judgment against that party where it 'fails to make a showing sufficient to establish the existence of an element essential to that party's case . . ..'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**B.      No Rational Interpretation Of Hudson's Response To Progressive's Follow-Up Question Regarding Q1b Shows That Response To Be Inaccurate.**

Progressive devotes a mere page and a half of its memorandum to its Q1b misrepresentation argument.  Progressive's ploy with Q1b is to mischaracterize Hudson's response to Progressive's Q1b "mitigating controls" follow-up question as responding to Q1b

---

[6] Excerpts from the transcript of the October 1, 2007 Deposition of Mark R. O'Connell are attached as Exhibit A to the Affidavit of James M. Flaherty, Jr. in Support of the Opposition of Plaintiff Hudson Savings Bank to Progressive Casualty Insurance Company's Motion for Summary Judgment, filed herewith.

generally as opposed to simply answering the "mitigating controls" follow-up question.  For

example, Progressive argues that Hudson's explanation about its follow-up answer as relating

only to real estate loans is a misrepresentation because "the language of Question IV.1b does not

support a reading that would limit the question to only real estate closings."  (Progressive Mem.

at 24-25.)  As is clear from the Q1b chronology below, Hudson has never taken the position that

Q1b itself is limited to real estate closings.  Rather, it is Hudson's response to Progressive's

mitigating controls query that is directed to real estate closings.

Q1b asked:  "Are signatures on all notes and documents obtained in the presence of an

officer?"  (SMF ¶ 17.)  Hudson answered by checking the "No" box.  (*Id*. at ¶ 18.)  Progressive

then sent a follow-up question to Hudson, asking: "What are the mitigating controls for

signatures on notes and documents not obtained in the presence of an officer?"  (*Id*. at ¶ 23.)

Hudson replied to this follow-up question as follows:

> The Bank's loan officers may not always be present when all signatures are
> acquired on loan applications.  However, all loan closings are processed by
> attorneys representing the Bank for such transactions.  Therefore, in all cases the
> attorneys are either witnessing customers' signatures or properly identifying all
> parties before closing the loan.  (*Id*. at ¶ 24.)

It is plain from Hudson's response that it is directed to the follow-up question, and not

Q1b generally.  To make this clear, Hudson's response reiterates in the first sentence that "[t]he

Bank's loan officers may not always be present when all signatures are acquired on loan

applications."  In other words, to avoid any potential for confusion, Hudson confirms that the

answer to Q1b remains "No."  Then, in the next two sentences, Hudson provides the information

sought by Progressive's follow-up question seeking information about "mitigating controls for

signatures on notes and documents not obtained in the presence of an officer."  In response,

Hudson states that "all loan *closings* are processed by attorneys representing the Bank for such

transactions" (emphasis added), and "[t]herefore, in all cases the attorneys are either witnessing

customers' signatures or properly identifying all parties before closing the loan." Thus, Hudson informed Progressive of mitigating controls it employed for loans that involve a "closing" − the signatures are witnessed by an attorney or the attorney properly identifies all parties. Hudson did *not* represent that attorneys witness signatures or identify parties for all loans where an officer is not present.

Progressive's claim that Hudson's response must be understood to mean that the term "closing" applies to all loans, as opposed to just real estate loans, strains credulity. Such an interpretation would mean that attorneys acting on Hudson's behalf either witness customers' signatures or properly identify all parties on notes and documents related to *all* loans, including collateral (passbook) loans, which do not even involve an approving loan officer. As explained in Hudson's memorandum, such an "interpretation" is specious. For that reason, Hudson's express reference to "loan closings" and "attorneys" in its response to Progressive's "mitigating controls" follow-up query can only be interpreted as describing mitigating controls for real estate loans. As any banker knows, most loans (e.g., automobile loans, boat loans, credit card loans, collateral (passbook) loans) do not require the formalities of a closing attended by an attorney. (*Id*. at ¶¶ 97-98.) Moreover, even if Progressive did not know that loans other than real estate loans typically do not involve a closing attended by an attorney, as an insurer of community banks it is charged with this knowledge. *See City Fuel Corp.*, 446 Mass. at 639.

In sum, the only reasonable interpretation of Hudson's response to the "mitigating controls" follow-up question is that it confirmed and offered an explanation for Hudson's original "No" answer to Q1b in the first sentence and then described Hudson's mitigating controls for real estate loans in the second and third sentences. For these reasons and the reasons set forth in Hudson's memorandum in support of its renewed motion for summary judgment,

Progressive has no reasonable expectation of proving any misrepresentation with regard to Hudson's answer to Q1b, and Hudson therefore is entitled to judgment as a matter of law.  *See Deterra*, 226 F. Supp. 2d at 302-03.

## II.   MATERIALITY

Hudson firmly believes that the Court need not even reach the issue of materiality for the reasons articulated above and in Hudson's memorandum in support of its renewed summary judgment motion.  But, "[e]ven assuming that [Hudson] misrepresented facts in the application, under Massachusetts law whether a misstatement increases the insurer's risk of loss is ordinarily a question of fact on which the insurer bears the burden of proof."  *Technology Square*, 2007 WL 534450, at *11.  Progressive has failed to carry its burden.

As set forth in Hudson's memorandum in support of its renewed summary judgment motion, Douglas R. Emerick, Progressive's expert on the issue of materiality, admitted during his deposition that his opinion regarding the materiality of Hudson's alleged misrepresentations requires the combination of all *three* misrepresentations alleged by Progressive at the time of his deposition (Q1a, Q1b, and Q5c), and is *not* directed to each alleged misrepresentation individually.[7]  (SMF ¶¶ 121-26.)  Because Mr. Emerick's materiality opinion hinges upon the *combination* of all three of Hudson's alleged misrepresentations, it necessarily follows that if the Court finds *even one* of Hudson's answers was not a misrepresentation, then Progressive cannot carry its burden of proving the materiality of any of its alleged misrepresentations.

---

[7] As noted above, portions of the Emerick Affidavit are derived from a so-called "Supplemental Report" produced by Progressive, *after* Mr. Emerick was deposed, in which he effectively recants his deposition testimony that his opinion on materiality is premised on the *combined* effect of all three supposed misrepresentations Progressive has (until now) asserted.  Because the "Supplemental Report" is not authorized by Fed. R. Civ. P. 26(a)(2)(B), 26(b)(4), and 26(e)(2)and seeks to undermine these summary judgment proceedings, Hudson asks that the portions of the Emerick Affidavit that are derived from the "Supplemental Report" be disregarded and has filed a motion to strike seeking that relief.

Now, in view of Progressive's abandonment of its Q5c allegation of misrepresentation, one of the three required misrepresentations upon which Mr. Emerick's opinion rests is no longer being asserted.  On this basis alone, Progressive cannot carry its burden of proving the materiality of any of its alleged misrepresentations.  Further, even if the Court considers Q5c for purposes of Progressive's materiality argument only, unless the Court determines that *all three* of Hudson's alleged misrepresentations were actual misrepresentations, then Hudson is entitled to judgment as a matter of law due to a failure of proof in light of Mr. Emerick's combination opinion.  *See Deterra*, 226 F. Supp. 2d at 302-03.

As to Progressive's specific materiality contentions, Hudson must take issue with certain statements of law and fact as presented by Progressive.[8]  Hudson does, however, agree that the issue of materiality under the relevant Massachusetts statute − Mass. G.L. c. 175, § 186 − is evaluated according to an "objective standard."  (Progressive Mem. at 4.)  As explained by the United States Court of Appeals for the First Circuit, "the Massachusetts statute provides a definition to focus the [materiality] inquiry:  a false answer is material under section 186 if 'the matter represented . . . increased the risk of loss' for the insurer."  *Boston Mut. Ins. Co. v. N.Y. Islanders Hockey Club, L.P.*, 165 F.3d 93, 97 (1st Cir. 1999).  "Absent actual deceit, the materiality requirement limits avoidance to cases where an accurate answer could reasonably have affected an insurer's choices--for example, whether to insure the applicant, whether to impose exclusions, whether to charge a higher premium--decisions largely governed by perceptions as to the likelihood and magnitude of loss."  *Id.*

---

[8] Many of the legal propositions asserted by Progressive are red herrings and of no consequence to the issues before the Court.  This is either because the materiality determination is governed by a Massachusetts statute that controls the inquiry, *see* Mass. G.L. c. 175, § 186, or because the identified issues have not been raised by either party in advancing a claim or defense.  For example, the issues of (i) whether reliance on a misrepresentation by the insurer is necessary (Progressive Mem. at 5); (ii) whether a misrepresentation is innocent (*Id.*); and (iii) whether a misrepresentation must "materially" increase the risk of loss or be causally connected to the loss (*Id.* at 6.) are immaterial to the present action.

Put another way, a misrepresentation is considered material if it would have changed the underwriting stance of a reasonable underwriter when considering the insured's policy application. "Thus, the materiality of a misrepresentation depends on what a reasonable underwriter would have done differently had she known the truth behind the misrepresentation." *Federal Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 34 (1st Cir. 2007) (citing *Boston Mut.*, 165 F.3d at 97). However, proof that the insurer would have actually acted differently had she known the truth behind the misrepresentation is not required under the statute. *Boston Mut.*, 165 F.3d at 97.

Progressive's recitation of the applicable case law goes astray in its discussion of when a misrepresentation may be deemed material as a matter of law. (Progressive Mem. at 7.) According to Progressive, information concerning a bank's internal controls is material to the underwriting of a Bond as a matter of law. More specifically, Progressive asserts that "information in a bond application bearing on the risk of loss due to employee dishonesty is material, as a matter of law." (Progressive Mem. at 9.) But this argument proves too much. If true, it would read the materiality element out of the Massachusetts statute entirely. This, of course, cannot be the correct reading of the law, as indicated by this Court's decision to allow the issue of materiality to be tried by a jury in a case involving an employee dishonesty insurance policy, with the jury finding in favor of the insured. *See Federal Ins. Co. v. HPSC, Inc.*, No. 02-CV-11822, 2005 WL 2206071, at *7-8 (D. Mass. Sept. 12, 2005), *aff'd*, 480 F.3d 26 (1st Cir. 2007).

Rather, as noted by the First Circuit in *Boston Mutual*, "[w]hether a misstatement increases the insurer's risk of loss 'is ordinarily a question of fact.'" *Boston Mut.*, 165 F.3d at 97. Progressive correctly states that "[t]here are a variety of ways to objectively prove what 'a reasonable underwriter' would do, including through competent expert testimony or for the

insurer to present evidence of its own policies and practices." (Progressive Mem. at 5.)
Importantly, Progressive neglects to note that an insured may also present evidence of the
insurer's policies and practices to establish immateriality. *HPSC*, 480 F.3d at 34.

Here, each party has retained an expert on the issue of materiality – Mr. Emerick by
Progressive and William K. Austin by Hudson. Setting aside for one moment the fact that Mr.
Emerick's materiality opinion hinges upon the combination of three alleged misrepresentations,
there is a genuine factual dispute about whether a reasonable insurer (assuming Hudson
misrepresented its internal controls in answering Q1a, Q1b, and/or Q5c) would have changed its
underwriting stance in view of complete information about Hudson's internal controls relating to
each of Q1a, Q1b, and Q5c. This dispute boils down to Mr. Austin's opinion that, based on his
experience with underwriting and risk management, and his review of Progressive's policies and
practices, a reasonable insurer would not have changed its underwriting stance in view of
complete information about Hudson's internal controls relating to each of Q1a, Q1b, and Q5c,
and Mr. Emerick's opposing opinions for each of Q1a, Q1b, and Q5c. (*Compare* RMF ¶¶ 127-
29 and the Affidavit of William K. Austin (filed herewith) *with* Progressive Statement ¶¶ 44-64
and the Affidavit of Douglas R. Emerick (Dkt. No. 63).) Based on these competing opinions
based on underlying factual disputes, the issue of the materiality of Q1a, Q1b, and Q5c is not
appropriately resolved by the Court on summary judgment.

Near the end of its materiality section, Progressive makes a half-hearted argument that
Hudson is bound by a "deemer clause" included in the Bond application stating that all
information sought by the application is acknowledged by the applicant to be material to
Progressive's decision to underwrite the Bond. (Progressive Mem. at 14.) It is not surprising

that Progressive gives this argument such short shrift, as the language of Mass. G.L. c. 175,

§ 186 clearly overrides such a "deemer clause":

> No oral or written misrepresentation or warranty made in the negotiation of a
> policy of insurance by the insured or in his behalf *shall be deemed* material or
> defeat or avoid the policy or prevent its attaching unless such misrepresentation or
> warranty is made with actual intent to deceive, or unless the matter
> misrepresented or made a warranty increased the risk of loss.  (Emphasis added.)

Accordingly, Progressive's argument is without merit.

Similarly, Progressive attempts to override the language of Mass. G.L. c. 175, § 186 with

its "condition precedent" argument.  (Progressive Mem. at 14-16.)  According to Progressive, the

receipt of truthful information in response to the Bond application questions was a condition

precedent to issuing the Bond, and Hudson's alleged failure to comply voids coverage under the

Bond regardless of an increased risk of loss.  By its terms, this argument overrides the materiality

requirement of Mass. G.L. c. 175, § 186 *if* a warranty or representation under the statute can be

properly re-characterized as a condition precedent.

Progressive is wrong, however, in its blanket assertion that the receipt of truthful

information is a condition precedent rather than a warranty or representation.  According to

*Sullivan v. John Hancock Mut. Life Ins. Co.*, 342 Mass. 649 (1961), and its progeny, truthful

answers to questions in an original application for insurance, as opposed to applications for

reinstatement or statements in proofs of loss, are ordinarily considered to be either warranties or

representations and not conditions precedent.  *See, e.g., Sullivan*, 342 Mass. at 653; *Shaw*, 359

Mass. at 605-06.  Because Mass. G.L. c. 175, § 186 "applies only to representations or

warranties and not to conditions precedent[,] . . . it logically follows that answers to questions in

an original application for insurance are either representations or warranties and not conditions

precedent."  *Sullivan*, 342 Mass. at 653-54.

The cases Progressive cites in support of its "condition precedent" argument are distinguishable from the *Sullivan* line of cases and the present situation.  For example, in two of the cases relied upon by Progressive, the court held that the misrepresentations were warranties and not conditions precedent to recovery because the misrepresentations were made in the policy application without the requisite "condition precedent" language or the equivalent.  *See General Star Indemnity Co. v. Duffy*, 191 F.3d 55, 60 n.2 (1st Cir. 1999); *Kobico, Inc. v. Pipe*, 44 Mass. App. Ct. 103, 107-08 (1997).  In other cases relied on by Progressive, the misrepresentations found to be conditions precedent related to policy requirements (conditions) and not responses to questions on policy applications.  *See Drake Fishing, Inc. v. Clarendon Am. Ins. Co.*, 136 F.3d 851, 853-53 (1st Cir. 1998); *Charles, Henry & Crowley Co. v. Home Ins. Co.*, 349 Mass. 723, 725-26 (1965); *Krause v. Equitable Life Ins. Co.*, 333 Mass. 200, 203-04 (1955).

Regarding *Massachusetts Mutual Life Insurance Company v. Fraidowitz*, the misrepresentation concerned the "condition of not being disabled when purchasing additional coverage" under an existing disability insurance policy.  443 F.3d 128, 133 (1st Cir. 2006).  In that case, the condition precedent was the requirement that the insured not be disabled to obtain additional coverage as opposed to the receipt of truthful information generally.  *Id.* at 132.  Such a specific requirement is very different from the generalized receipt of truthful information in response to the Bond application questions that Progressive argues should be treated as a condition precedent here.  Accordingly, because the present situation aligns with the *Sullivan* line of cases as opposed to the cases relied upon by Progressive, Progressive's "condition precedent" argument is also without merit.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Hudson Savings Bank respectfully requests that the Court deny Defendant Progressive Casualty Insurance Company's Motion for Summary Judgment in its entirety.

Respectfully submitted,

HUDSON SAVINGS BANK

By its attorneys,

/s/ James M. Flaherty, Jr.
Martin C. Pentz (BBO #394050)
mpentz@foleyhoag.com
James M. Flaherty, Jr. (BBO #653643)
jflaherty@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

Dated: May 7, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Presently there are no non-registered participants.

/s/ James M. Flaherty, Jr.
James M. Flaherty, Jr.