UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUDSON SAVINGS BANK,<br><br>    Plaintiff,<br><br>v.<br><br>PROGRESSIVE CASUALTY INSURANCE COMPANY,<br><br>    Defendant. | CIVIL ACTION No. 06-11967 |

**AFFIDAVIT OF JAMES M. FLAHERTY, JR. IN SUPPORT OF PLAINTIFF HUDSON SAVINGS BANK'S MOTION TO STRIKE PORTIONS OF THE AFFIDAVIT OF DOUGLAS R. EMERICK IN SUPPORT OF PROGRESSIVE CASUALTY INSURANCE COMPANY'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

I, James M. Flaherty, Jr., hereby depose and state as follows,

1. I am counsel for Hudson Savings Bank in the captioned matter.

2. Attached as Exhibit A are excerpts from the January 17, 2008 Deposition of Douglas R. Emerick.

3. Attached as Exhibit B is a true and accurate copy of the "Supplemental Report by Douglas R. Emerick," dated February 26, 2008.

Signed under the penalties of perjury this 7th day of May, 2008.

                /s/ James M. Flaherty, Jr.
                James M. Flaherty, Jr.

- 2 -

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Presently there are no non-registered participants.

/s/ James M. Flaherty, Jr.
James M. Flaherty, Jr.

# EXHIBIT A

Hudson Savings Bank
v.
Progressive Casualty Insurance Company

C. A. No. 06-11967

Exhibits: 100-103                Volume 1, Pages 1- 151

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 06-11967

- - - - - - - - - - - - - - - - - - - - - - - - - - -

HUDSON SAVINGS BANK,

        Plaintiff

v.

PROGRESSIVE CASUALTY INSURANCE

COMPANY,

        Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DOUGLAS R. EMERICK

Thursday, January 17, 2008, 9:03a.m.

Foley Hoag LLP

155 Seaport Boulevard

Boston, Massachusetts


- - - - - - -Reporter:  Susan J. Blatt, RPR- - - - - - -

sblatt@fabreporters.com    www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

1   APPEARANCES:
2
3   Foley Hoag LLP
4       James M. Flaherty, Jr., Esq.
5       Seaport World Trade Center West
6       155 Seaport Boulevard
7       Boston, Massachusetts 02210-2600
8       617.832.1000   Fax: 617.832.7000
9       jflaherty@foleyhoag.com
10      for Plaintiff
11
12  Holland & Knight, LLP
13      Deborah S. Griffin, Esq.
14      10 St. James Avenue
15      Boston, Massachusetts 02116
16      617.523.2700   Fax: 617.523.6850
17      deborah.griffin@hklaw.com
18      for Defendant
19
20
21
22
23
24

Douglas R. Emerick
Volume 1 - January 17, 2008

81

```
 1    responding to your question as an opinion is not a
 2    limitation on what counsel believes constitutes an
 3    opinion, and his report is what it is, and we're
 4    going to offer any part of what he says.
 5         MR. FLAHERTY:  Well, I think I'm
 6    entitled to know what Mr. Emerick thinks his
 7    opinions are for today's purposes and I think he's
 8    identified four of them today.
 9         Q.  Can you turn back to Exhibit 90, please.
10    And back to your opinions, opinion number one.
11    Opinion number one, "In relation to the application
12    Exhibit 6," list of Bates numbers, "for Financial
13    Institution Bond, Hudson materially misrepresented
14    its operational characteristics in its answers to
15    the application questions IV.1.a, IV.1.b, IV.5.c and
16    did so also in a certain subsequent response
17    (Exhibit 7) to Progressive's inquiries concerning
18    these answers."  Is that accurate?
19         A.  That's accurate.
20         Q.  Can you identify -- strike that.  With
21    respect to opinion number two, for the record, it
22    states "A Financial Institution Bond underwriter
23    probably would have taken a different underwriting
24    stance if the actual nature of Hudson's operational
```

1  processes had been accurately represented in this
2  application. An underwriter would have most likely
3  declined the bank or quoted the coverage based on
4  strict conditions that certain internal control
5  programs be instituted." Is that accurate?
6      A. That's accurate.
7      Q. The first sentence of that opinion number
8  two states "taken a different underwriting stance."
9  Can you explain what you meant by that phrase?
10     A. Underwriting stance as thought of by an
11 underwriter begins at the simple accept or decline,
12 and then within the accept, the underwriting stance
13 can be modified by the premium an underwriter is
14 willing to quote, the deductible the underwriter is
15 willing to provide, the coverages that the
16 underwriter is willing to offer, the modifications
17 that they're willing to entertain, and sometimes the
18 commissions the underwriter is willing to offer the
19 broker on the piece of business.
20     Q. With respect to modifications, would those
21 be modifications in the policy itself or something
22 else? Please explain what you mean by
23 modifications.
24     A. Predominantly what I mean is modifications,

```
 1        Q.   When you say could apply to one or more
 2   individually --
 3        A.   In a hypothetical situation.
 4        Q.   Is your opinion number two directed to 1.a
 5   alone, question 1.a alone?
 6             MS. GRIFFIN:   Objection.
 7        A.   No.
 8        Q.   Is your opinion number two directed to
 9   question 1.b alone?
10        A.   It possibly could be.
11        Q.   And is your opinion number two directed to
12   question 5.c alone?
13        A.   Not in and of itself, but in addition it
14   possibly could be.
15        Q.   It possibly could be alone -- sorry.
16   Strike that.  Let's clean that up a bit.
17             Is your opinion number two directed to
18   5.c independently?
19        A.   No.
20        Q.   Just so we're clear, your opinion number
21   two is directed to the combination of all three
22   questions?
23        A.   As presented to me, that is how I wrote
24   this opinion, yes.
```

# EXHIBIT B

Hudson Savings Bank
v.
Progressive Casualty Insurance Company

C. A. No. 06-11967

# Hudson Savings Bank

### v.

# Progressive Casualty Company

United States District Court
District of Massachusetts

Civil Action No. 06 CA 11967 RGS

Supplemental Report By

Douglas R. Emerick

2/26/2008

Supplemental Report                           Douglas R. Emerick                                 2/26/2008

I have been asked to provide this supplemental report to respond to topics needing further clarification and explanation. A deeper examination of the materiality of answers to each, individually, of the subject questions was raised and reflected in the depositions of both Mr. Austin and my own. I have had sufficient time to formulate my opinion on the materiality of the three questions at issue in this case, each individually. I have been able to reflect further as an underwriter to these issues and to compare my conclusions with other authorities on the matter of materiality. At issue in this matter and those subject to my further reflection are the following questions:

**Question IV.1.a** Are loan proceeds issued by someone other than the approving loan officer?
**Question IV.1.b.** Are signatures on all notes and documents obtained in the presence of an officer?
**Question IV.5.c.** - Is there a formal program requiring segregation of duties, so that no single transaction can be fully controlled from origination to posting by one person?

Individually, the answers to these questions but also together with the answers to the other questions on the application and with other information gathered seek to provide sufficient intelligence about a bank so that an underwriter can assess whether to provide insurance. Each answered question in Section IV of the Progressive application (Exhibit 6), obtains from an insured information that the underwriter uses to evaluate whether an applicant is more likely or less likely to produce a loss.

Both Charles Nyce[1] and Karen Porter[2], in their respective CPCU textbooks, state verbatim that a material fact is "In insurance, a fact that would affect the insurer's decision to provide or maintain insurance...." Mr. Nyce, continues, "Any fact the insurer specifically asks about is material."[3] I agree with this statement. It is my opinion that all answers and responses to the internal control questions both individually and in combination are material to the underwriter determining whether a certain bank will present a greater risk of loss to the insurance company than that which the insurance company is willing to accept.

In Question IV.1.a, the underwriter is seeking to discover whether loan officers have not only control to begin the lending process, document and approve the loan but also to take the final step of providing (disbursing) the funds to the borrower. With this kind of transactional control a lending officer has complete control of the lending transaction. The likelihood that an officer could create fictitious borrowers or misdirect the loan proceeds, causing an insurable loss on the financial institution bond greatly increases.[4] The answer to this question is material to the underwriting of a bank and it or any follow-up explanation provides sufficient grounds, to significantly influence the underwriting stance toward the bank. Consequently a misrepresentation overstating the conditions underlying the answer to this question alone would understate the increased risk of loss.

The carrier seeks, in question IV.1.b. to determine whether a bank has policies and procedures in place that help ensure loan instruments are genuine and issued to a valid borrower by ensuring that signatures of borrowers are obtained in the presence of a bank officer. In the production of loan

---

[1] Foundations of Risk Management and Insurance, Charles M. Nyce, PhD, Second Edition, AICPCU, 9.20
[2] The Legal Environment of Insurance, Karen Porter, JD, CPCU, ARP, First Edition, AICPCU, 5.6
[3] Nyce, 9.20
[4] It is this level of control that gave Milton Pereira the ability to defraud Hudson over the extended period of time that he perpetrated that loss.

Page 2

Supplemental Report		Douglas R. Emerick		2/26/2008

business one of the common insurable loss scenarios involves loans to fictitious borrowers. In essence a bank needs to make sure that the person it thinks it is lending the money to is actually the person who signs the lending documents. An underwriter will want to see all on-site signatures are done in the presence of an officer or other employee. If a bank has a practice of accepting loan documents signed off site but not notarized or identity of signatories confirmed otherwise, the underwriter will see the possibility of loss increase significantly. This question is material and with an unsupportable all inclusive situational explanation to it[5], the underwriter would most likely develop an incorrect comfort level with this internal control believing that the risk of loss is much less than what actually exists. Consequently a misrepresentation overstating the conditions underlying the answer to this question alone would understate the increased risk of loss.

A segregation of duties program, the existence of which is sought to be determined by Question IV.5.c, is of paramount importance to secure operation of a financial institution. Without segregation of duties, or other mitigating controls and oversight, bank personnel would be able to control cash, loan and other transactions from beginning to end – from origination to posting, opening the bank to large losses that sooner or later would probably occur. An underwriter would not provide a Financial Institution Bond to a bank that had no segregation of duties or other mitigating controls and oversight, knowing that the risk of loss that such a bank presented would be much greater than that of other banks the underwriter would likely see and write instead. By itself, segregation of duties, the presence and pervasiveness of it, is one of the strongest indicators of risk of operational losses for a bank. Together with other internal control indicators such as those addressed in the other two questions, it is even more indicative of the risk of loss level a bank is presenting to the underwriter. Consequently a misrepresentation overstating the conditions underlying the answer to this question alone would understate the increased risk of loss.

Absent these three questions on an application an underwriter, by other means, would seek to understand how a bank processes and disburses loans, and for all transactions, if a single employee were able to control them from beginning to end. This simply is the subject matter of these three questions. The answers to these questions are part of the creation, for the underwriter, of an understanding of how well the bank is able to mitigate the risk of loss insurable under the Financial Institution Bond. Each answer to the questions is material to that understanding and consequently as indicators of lesser or greater risk of loss.

My opinion is expressed to a reasonable degree of underwriting certainty. I reserve the right to modify, add to or change my opinion if additional information becomes available to me.

Sincerely,

*Douglas R. Emerick* (signature)

---

[5] Hudson provided in Exhibit 7 such an unsupportable answer that to an underwriter would most likely appear to be an all inclusive situational response.

Page 3